IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


ANTHONY T. MALCOMB,

      Plaintiff,

v.                             Case No. 2:09-cv-00647

DR. DESIGNU RAJA,
DR. ANTOINE KATINY, and
VICKI SMITH, APRN-BC,[1]

      Defendants.


### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court is a Motion to Dismiss filed by defendants PrimeCare Medical of West Virginia, Inc. (hereinafter "PrimeCare")[2], Dr. Antoine Katiny, M.D. and Vicki Smith, APRN-BC (docket sheet document # 39).  This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[1]    According to the defendants' filings, these are the appropriate spellings of names and titles for each of the remaining defendants.  The Clerk is directed to modify the docket sheet to reflect these corrections.

[2]    Since the filing of this motion, Plaintiff moved to voluntarily dismiss PrimeCare as a defendant, which motion (# 75) was granted by Order entered June 30, 2010 (# 77).

## PROCEDURAL HISTORY

Plaintiff filed his original Complaint under 42 U.S.C. § 1983 on or about June 9, 2009 (# 3).  The initial Complaint named the following defendants: Thomas Scott, Administrator of the Southwestern Regional Jail, Michael Harvey, 1st Lieutenant, M. Scott Hager, 1st Sergeant, Lynn Holloway Shift Supervisor, all employees at the Southwetern Regional Jail, Dr. (Designu) Raja, Medical Specialist, Logan, West Virginia, Dr. John Doe, Medical Doctor, Southwestern Regional Jail, Dr. Jane Doe, Medical Doctor, Southwestern Regional Jail, and PrimeCare Medical Services Provider, Southwestern Regional Jail.  (Id.)

Subsequently, Plaintiff moved for the voluntary dismissal of defendants Scott, Harvey, Hager, and Holloway, and also moved to amend his Complaint to substitute Dr. Antoine Katiny for Dr. John Doe, and Vicki Smith for Dr. Jane Doe.  The undersigned granted those motions (# 28).

On September 9, 2009, defendants Katiny and Smith filed the pending Motion to Dismiss and alternative Motion for Summary Judgment, with accompanying exhibits (# 39), and a Memorandum of Law in support thereof (# 40).  On October 1, 2009, defendant Dr. Raja filed his own Motion to Dismiss (# 44).  However, that Motion to Dismiss was denied by the court on April 21, 2010 (# 69), and this matter as it pertains to Dr. Raja is proceeding through the discovery stage.

On October 21, 2009, Plaintiff filed a Memorandum of Law in Opposition to defendant Katiny and Smith's Motion to Dismiss and alternative Motion for Summary Judgment (# 47).

On November 6, 2009, defendants Katiny and Smith filed a Reply to Plaintiff's Memorandum of Law in Opposition (# 52).

On June 25, 2010, Plaintiff filed another Memorandum of Law in Opposition to defendant Katiny and Smith's Motion to Dismiss and alternative Motion for Summary Judgment (# 76).

On July 2, 2010, defendants Katiny and Smith filed a Second Reply to Plaintiff's Memorandum in Opposition to the Motion to Dismiss and alternative Motion for Summary Judgment (# 79).

This matter is ripe for determination.

### STANDARD OF REVIEW

Defendants Katiny and Smith have filed a Motion to Dismiss and alternative Motion for Summary Judgment.  In <u>Bell Atlantic Corp v. Twombly</u>, 550 U.S. 544, 555 (2007), the Supreme Court observed that a motion to dismiss should be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the non-moving party, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  <u>Id.</u>

The Supreme Court further explained its holding in Twombly in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), a civil rights case. The Court wrote:

> Two working principles underlie our decision in
> *Twombly*. First, the tenet that a court must accept as
> true all of the allegations contained in a complaint is
> inapplicable to legal conclusions. Threadbare recitals
> of the elements of a cause of action, supported by mere
> conclusory statements, do not suffice. [*Twombly*, 550
> U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes
> of a motion to dismiss we must take all of the factual
> allegations in the complaint as true, we "are not bound
> to accept as true a legal conclusion couched as a factual
> allegation" (internal quotation marks omitted). Rule 8
> . . . does not unlock the doors of discovery for a
> plaintiff armed with nothing more than conclusions.
> Second, only a complaint that states a plausible claim
> for relief survives a motion to dismiss. *Id.*, at 556. *
> * *
>
> In keeping with these principles a court considering
> a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether
> they plausibly give rise to an entitlement to relief.

129 S. Ct. at 1949-50.

In evaluating summary judgment motions, Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought should be rendered if the pleadings,
> the discovery and disclosure materials on file, and any
> affidavits, show that there is no genuine issue as to any
> material fact and that the movant party is entitled to
> judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2007). Material facts are those necessary to establish the elements of a party's cause of action. Anderson

4

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

If the moving party meets this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.

> [A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy,

797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Because the court will rely upon information outside of the pleadings, the undersigned proposes that the presiding District Judge treat the defendants' motion as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Jeffers v. Wal-Mart Stores, Inc., 84 F. Supp.2d 775, 777 (S.D. W. Va. 2000).

## ANALYSIS

### A.   Plaintiff's Allegations.

In his Complaint documents, Plaintiff has chiefly complained that the defendants have been deliberately indifferent to his serious medical needs concerning a broken collar bone sustained in an alleged assault by another inmate at the Southwestern Regional Jail (the "SWRJ"), in Holden, West Virginia.

As noted by defendants Katiny and Smith in their Memorandum of Law, Plaintiff acknowledges that he was taken to the medical unit at the SWRJ, where a nurse, Nurse Holt, gave him pain medication,

6

put his arm in a sling, and arranged for him to be transferred to Logan Regional Medical Center ("LRMC") for treatment.  (# 3, ¶¶ 26, 27).

Plaintiff alleges that upon his return to the SWRJ from LRMC, he was housed in the booking area for two or three days.  Plaintiff alleges that, during that time, he was refused the medication that had been prescribed by the emergency room physician at LRMC. Plaintiff alleges that he was in pain, nauseated, suffered vertigo, had cold chills and was "very irritable."  (Id., ¶ 29).

Plaintiff's Complaint, as amended, further alleges that he had to sleep on the floor of a cell in the medical unit, and that Dr. Katiny and Nurse Practitioner Smith, who were attending to him, refused to give him "lawfully prescribed pain medication as ordered by the emergency room doctor . . . ."  (Id., ¶¶ 30-32).  Plaintiff further alleges that Nurse Practitioner told him "she couldn't do anything for him" and that Dr. Katiny told Plaintiff he was "ruined."  (Id., ¶¶ 31, 32).  The Amended Complaint acknowledges that Plaintiff was ultimately given "Ultra" [sic; Ultram], Motrin, and Darvocet for his pain.  (Id., ¶ 33).

The remainder of Plaintiff's Amended Complaint contains allegations pertaining to his medical treatment by Dr. Designu Raja, an orthopedic surgeon to whom Plaintiff was referred for follow-up care, and concerning his transfer to various correctional facilities operated by the West Virginia Division of Corrections,

7

at which facilities PrimeCare and its staff do not provide medical care to inmates.  Accordingly, the undersigned need not address those allegations herein.  (<u>Id.</u>, ¶¶ 34-47).

Plaintiff alleges that he has been harassed for seeking medical treatment, and accused of lying to get pain medication that was legally prescribed to him.  Plaintiff seeks a declaration that his constitutional rights have been violated, and monetary damages from each of the defendants individually and severally.  (<u>Id.</u>, ¶¶ 51-52).

Defendants Katiny and Smith contend that Plaintiff's allegations fail to meet the standard necessary to show a deprivation of his rights under the Eighth Amendment.  (# 40 at 11-15).  They argue that Plaintiff's allegations, at most, demonstrate a disagreement between Plaintiff and his medical providers about Plaintiff's pain treatment.  (<u>Id.</u> at 14).  Defendants Katiny and Smith further assert that they are entitled to qualified immunity on Plaintiff's Eighth Amendment claims against them.  (<u>Id.</u> at 16-19).

**B.  Deliberate indifference standard.**

In <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take

8

reasonable measures to guarantee the safety of the inmates.'"  The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" Id., at 833.

To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." Id., at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id., at 837.

Plaintiff's Complaint alleges that the defendants have exhibited a deliberate indifference to Plaintiff's serious medical needs, in violation of his Eighth Amendment rights.  "In order to state a cognizable claim for denial of medical care under the Eighth Amendment, an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "To establish that a health care provider's actions constitute deliberate indifference

9

to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting cases). "Serious medical needs" are those which have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Munic. of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).

> Deliberate indifference may be demonstrated by either actual intent or reckless disregard. See Benson v. Cady, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. See id. Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. See Estelle, 429 U.S. at 106.

Miltier, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need by correctional officials and health care providers is very heavy. It is well settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. See Farmer, 511 U.S. at 832-35; Sosebee v. Murphy, 797 F.2d 182-83 (4th Cir. 1986); Loe v. Armistead, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

Rush v. VanDevander, 2008 WL 495651 (W.D. Va., Feb. 21, 2008);

Banks v. Green Rock Correctional Center Medical Dept., 2007 WL
2903673 (W.D. Va., Oct. 3, 2007).  For example, in Sosebee, the
Fourth Circuit found that if prison guards were aware that a steak
bone had pierced an inmate's esophagus, causing infection that
resulted in the inmate's death, and the guards had intentionally
abstained from seeking medical help, such conduct might establish
deliberate indifference to a serious medical need.

In Webster v. Jones, 554 F.2d 1285 (4th Cir. 1977), the
plaintiff, who had complained numerous times of eye problems and
loss of vision, claimed that he was cursorily examined after his
initial complaint, but never re-examined despite later complaints.
The doctor claimed that he examined Webster several times, but
never diagnosed a medical problem with his eye.  Id. at 1286.
Subsequently, a specialist found that Webster's vision had
deteriorated to 20/400 and that he suffered from a detached retina
and iritis, and that his vision could not be restored.  Id.  The
Fourth Circuit found that, even if the doctor had been negligent in
failing to properly diagnose or treat Webster, negligence is not
sufficient to demonstrate deliberate indifference to a serious
medical need and, thus, Webster's allegations did not constitute a
cognizable constitutional claim.  See also, Johnson v. Quinones,
145 F.3d 164, 168 (4th Cir. 1998).

Likewise, disagreements between a health care provider and the
inmate over a diagnosis and the proper course of treatment are not

11

sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985); <u>Russell v. Sheffer</u>, 528 F.2d 318, 319 (4th Cir. 1975).  As noted by the Fourth Circuit, an inmate is not entitled to unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate.  <u>Bowring v. Godwin</u>, 551 F.2d 44, 47-48 (4th Cir. 1977).

**C. Undisputed facts from medical records.**

Defendants Katiny and Smith have submitted Plaintiff's medical records from the SWRJ, along with Affidavits from Cheryle Stuart, RN, Vicki Smith, APRN-BC, and Antoine Katiny, MD.  The facts as presented by these defendants are derived from the medical records and the supporting affidavits.

Plaintiff was first received in the SWRJ and medically screened on June 23, 2006.  (# 39, Ex. A, ¶ 9).  On June 17, 2007, Plaintiff was brought to the medical unit at the SWRJ after reportedly being involved in an altercation with other inmates.  Examination by Paula Holt, LPN, revealed a deformity of Plaintiff's left shoulder.  Ms. Holt advised nurse practitioner Vicki Smith of Plaintiff's injury, and Smith ordered that Plaintiff be transported to the emergency department at the LRMC for evaluation and treatment.  (<u>Id.</u>, ¶ 10; # 39, Ex. B, ¶¶ 11-12).

12

An x-ray taken at the LMRC revealed that Plaintiff had sustained a fractured left clavicle. The radiologist also identified a calcific density under the left clavicle that was thought to be related to an old injury. (# 39, Ex. A, ¶ 12). Plaintiff was treated with a clavicle strap and arm sling, and was given a prescription for Lortab, 5 mg to be given every 4 to 6 hours for pain. As noted by the defendants, Lortab is a narcotic pain reliever made up of a combination of Acetaminophen and Hydrocodone. Plaintiff was directed to follow up with an orthopedic surgeon in three to four days. (Id., ¶ 13).

Upon his return to the SWRJ, Plaintiff was initially housed in the booking area because there was not available space in the medical unit. (Id., ¶ 15). At approximately 5:00 p.m. on June 17, 2007, Kristi Sorrell, LPN, called nurse practitioner Smith to request orders to address Plaintiff's pain complaints. Smith was advised that Plaintiff had been prescribed 5 mg of Lortab by the emergency room physician at LMRC. However, Lortab was not on PrimeCare's approved formulary of prescription and over-the-counter drugs. (# 39, Ex. B, ¶¶ 13, 15).

According to nurse practitioner Smith's affidavit, it is her general practice to request off-formulary medications when it becomes apparent that no medication on the formulary will adequately address the inmate/patient's medical needs. (Id., ¶ 14). On June 17, 2007, Smith ordered that Plaintiff be given

13

Ultram, 50 mg twice a day for 14 days, as needed for his pain. (Id., ¶ 15). According to the defendants' Memorandum, Ultram (generically known as Tramadol) is a narcotic-like pain reliever used to treat moderate to severe pain. (# 40 at 5 n.5). Plaintiff had already been receiving Ultram 25 mg twice a day, as needed, for a prior complaint of back pain, pursuant to Smith's April 25, 2007 order. (# 39, Ex. B, ¶ 15).

Plaintiff was seen by Smith on June 20, 2007, for a follow-up evaluation of his clavicle injury and follow-up for another unrelated chronic condition. Plaintiff complained about the pain in his left clavicle, and also complained about blood in his stool and urine. Plaintiff also requested that he be given Darvocet, instead of Ultram. (Id., ¶ 16).

On June 20, 2007, Smith ordered that Plaintiff be scheduled for a consultation evaluation by an orthopedic surgeon regarding his clavicle injury. Smith also ordered that Plaintiff continue to receive 50 mg of Ultram twice a day, as needed, for pain. Smith's affidavit states that, because she had just increased Plaintiff's dosage of Ultram three days earlier, in her professional judgment, Plaintiff needed to give the Ultram more time to work. Smith further indicated that, because Plaintiff had requested Darvocet, she was concerned that he was potentially drug-seeking. She further indicates that she was aware that Plaintiff had been an IV drug user. (Id., ¶ 17).

14

On June 23, 2007, Smith saw Plaintiff in the medical unit for continued complaints about his shoulder pain. Smith noted on physical examination that there was bruising and edema of the Plaintiff's left shoulder. She noted that Plaintiff was awaiting consultation with an orthopedic surgeon. In light of Plaintiff's continued complaints of pain, Smith ordered that he receive Darvocet N-100, twice a day for seven days, after which he was to receive 100 mg of Ultram, twice a day for 90 days. (Id., ¶ 18 & Ex. 2).

On June 25, 2007, an appointment was scheduled by the nursing staff at the SWRJ for Plaintiff to see an orthopedic surgeon. (# 39, Ex. A, ¶ 20 & Ex. 1). On June 27, 2007, Plaintiff was examined by Dr. Designu Raja, an orthopedic surgeon practicing in Logan, West Virginia. Dr. Raja recommended that Plaintiff's treatment should be non-operative. A follow-up appointment was scheduled for July 18, 2007. (Id., ¶ 21 & Ex. 3).

On July 1, 2007, Smith made a telephone order to extend Plaintiff's receipt of Darvocet N-100 for an additional seven-day period. On July 20, 2007, Plaintiff was again seen by Dr. Raja, who scheduled an x-ray of Plaintiff's shoulder for his next appointment on August 17, 2007. (# 39, Ex. B, ¶ 19 & Ex. 3).

On August 17, 2007, Plaintiff was seen again by Dr. Raja. Dr. Raja's progress note indicates that Plaintiff denied being in pain at that time. Dr. Raja's physical examination revealed no

tenderness at the fracture site.  His interpretation of an x-ray taken that day indicated that the clavicle was in excellent alignment and position, and that there was evidence of callous formation, which is a sign of healing of a bone fracture. Plaintiff was scheduled to follow-up again with Dr. Raja in eight weeks.  This progress note was received by facsimile in the SWRJ medical unit on October 26, 2007.  (# 39, Ex. A, ¶ 24 & Ex. 5).

Nurse practitioner Smith next saw Plaintiff in the medical unit at the SWRJ on September 26, 2007, for his unrelated chronic condition.  At that time, Plaintiff complained to Smith about a knot in his left shoulder.  Plaintiff told Smith that the doctor at the LMRC had told him there was nothing that could be done for his shoulder.  Smith ordered that Plaintiff be given Ultram 50 mg, twice a day for 90 days, as needed for pain.

Smith next saw Plaintiff in the medical unit at the SWRJ on October 10, 2007 for his complaints of shoulder pain.  Plaintiff told Smith that his left shoulder was "messed up bad" and that Dr. Raja "would not touch" his shoulder.  Plaintiff requested that photographs of his shoulder be taken, and he requested that he be seen by a new doctor.  Plaintiff refused to allow Smith to examine him and would not attempt any range of motion movements of his shoulder.  Despite not being able to examine Plaintiff's shoulder, Smith continued the order of Ultram 50 mg, twice a day for 90 days, as needed for Plaintiff's pain.  At that time, Smith had not been

16

made aware of Dr. Raja's findings from Plaintiff's last visit on August 17, 2007. (Id., ¶¶ 22-23).

On October 23, 2007, Smith saw Plaintiff again in the medical unit of the SWRJ for continued complaints of shoulder pain. Again, Plaintiff refused to allow Smith to examine his shoulder. Plaintiff was refusing all of his ordered medication, except for the prescribed dosage of Ultram. At that time, Smith referred plaintiff to be seen by Dr. Katiny. (Id., ¶ 25).

Plaintiff was again seen by Dr. Raja on October 29, 2007. Plaintiff was scheduled to be seen by Dr. Raja again on December 5, 2007, and to have an x-ray taken prior to that visit. (# 39, Ex. A, ¶ 25 & Ex. 6).

Plaintiff first saw Dr. Katiny on November 14, 2007 in the medical unit at the SWRJ. Dr. Katiny obtained a medical history, both from Plaintiff and from a review of Plaintiff's medical chart. Dr. Katiny also obtained Dr. Raja's progress notes. On November 14, 2007, Plaintiff complained of ongoing pain at the site of his clavicle fracture. Dr. Katiny discussed the healing process of a clavicle fracture with Plaintiff. He told Plaintiff that, most of the time, clavicular fractures heal on their own. He recommended exercises in the form of range of motion of the shoulder. He also ordered that Plaintiff receive Darvocet N-100, twice a day for three weeks, if needed for pain. (# 39, Ex. C, ¶¶ 9-13 & Exs. 1-3).

17

Plaintiff was transferred out of the SWRJ on November 30, 2007, prior to his scheduled appointment with Dr. Raja on December 5, 2007.  (# 39, Ex. A, ¶ 26).  Thus, Plaintiff's care by the defendants concluded at that time.

Defendants Katiny and Smith assert that they had no control over where Plaintiff was able to sleep.  Their Memorandum further asserts:

> The scenario outlined above establishes that the nursing staff at the SWRJ and nurse practitioner Smith saw to it that Mr. Malcomb was promptly examined and treated at the LRMC emergency department for his acute clavicle fracture following the alleged assault by fellow inmates.  The medical and nursing staff also saw to it that Mr. Malcomb had numerous follow-up visits with an orthopedic surgeon in order that the healing of his clavicle fracture could be appropriately followed.  The plaintiff had frequent visits with nurse practitioner Smith for his complaints, and had one visit with Dr. Katiny for those same complaints.  These facts establish that the employees and staff of PrimeCare at the SWRJ, including Ms. Smith and Dr. Katiny, were not deliberately indifferent to any serious medical need on the part of the plaintiff.

(# 40 at 9).  The Memorandum further asserts:

> There are no allegations in the complaint that satisfy the objective standard.  Plaintiff has not alleged that he suffered any serious deprivations of his basic human needs.  On the contrary, plaintiff alleges that he was promptly sent to the emergency department after his injury (*See* Complaint ¶ 27), but complains that he was not given the particular medication prescribed by the emergency department physician (*See* Complaint ¶ 29), although he acknowledges that he was given different pain medications such as Ultram, Motrin, and Darvocet for his pain, instead of medication "legally prescribed" by the emergency physician at LRMC.  (*See* Complaint ¶ 33).  Viewing the complaint in a light most favorable to the plaintiff, in essence, plaintiff's claim against . . . nurse practitioner Smith and Dr. Katiny amount to nothing

18

more than a disagreement over his proper manner of care. Such an allegation does not state a § 1983 claim.

(Id. at 14).

Defendants Katiny and Smith acknowledge that Plaintiff was not treated operatively while incarcerated at the SWRJ; however, they assert that they saw to it that he received emergency care at LRMC and had follow-up visits with an orthopedic surgeon. They contend that they are not accountable if the orthopedic surgeon indicated that surgery was not necessary. (Id. at 14-15).

Defendants Katiny and Smith further assert that Plaintiff has not demonstrated that they were subjectively indifferent to his medical needs. Their Memorandum notes that there are no allegations in the Complaint that either Smith or Katiny knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk "by failing to take any particular reasonable measures, such as failing to give him pain medication (as opposed to alleging that the pain medication he was given was not what plaintiff thought he should have received)." (Id. at 15). Defendants Katiny and Smith contend that the undisputed facts demonstrate that Plaintiff received appropriate treatment while at the SWRJ. (Id.)

Accordingly, defendants Katiny and Smith assert that Plaintiff cannot state a claim of deliberate indifference to a serious medical need and, thus, his Complaint fails to state an Eighth Amendment claim against them. These defendants further assert that they are entitled to qualified immunity on Plaintiff's claims.

19

Qualified immunity protects government officials from suits for civil damages arising out of the exercise of their discretionary functions.  Such immunity is available when the conduct of a government employee does not violate a clearly-established statutory or constitutional right of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As noted by the defendants herein, in West v. Atkins, 487 U.S. 42 (1988), the Supreme Court held that a heathcare provider who has contracted with a state to provide medical services to the state's prison inmates acts under color of state law for purposes of 42 U.S.C. § 1983.  Consequently, they are entitled to assert the defenses available thereunder.  (# 40 at 17).

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court held that in ruling on an issue of qualified immunity, a court must answer this threshold question:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" If the allegations do not give rise to a constitutional violation, no further inquiry is necessary.  Id.  If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case.  Id.  The Supreme Court revisited this standard in Pearson v. Callahan, 129 S. Ct. 808 (2009).  In Pearson, the Court held:

On reconsidering the procedure required in <u>Saucier</u>, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

129 S. Ct. at 818.

Defendants Katiny and Smith argue that, "in providing the health care services to the plaintiff as described in their respective affidavits, [they] could not reasonably be expected to know that they would be violating the plaintiff's statutory or constitutional rights." (# 40 at 18).  Their Memorandum further states:

Ms. Smith was simply exercising her best judgment and referring the plaintiff for timely definitive care in an emergency department, and to follow-up visits with an orthopedic surgeon.  Both Ms. Smith and Dr. Katiny were also exercising the[ir] professional judgment in making orders for appropriate medications to be given to the plaintiff to control his pain complaints.

Although it is well known that prison and jail inmates have a clearly established right to protection of their constitutional rights, an inmate cannot simply strip an official of his or her qualified immunity by making generalized, unsubstantiated statements. Instead, it is required that a right be clearly established to ensure that an official has ample notice of the legal standard that governs their conduct. Consistent with the requirement of notice, "the nature of the right allegedly violated must be defined 'at a high level of particularity.'" <u>Rogers v. Pendleton</u> 249 F.3d 279, 286 (4th Cir. 2001).  The plaintiff did not have a constitutional right to the administration of the pain medication of his choice.

(<u>Id.</u> at 18-19).

21

Plaintiff's Response filed on October 21, 2009 asserts that his allegations that he was in severe pain, and that "defendants Smith and Katiny deliberately turned a blind eye to that pain," are sufficient facts to entitle him to relief.   (# 47 at 6). Plaintiff's Response further asserts:

> As to the subjective test, the plaintiff asserts that defendants Smith and Katiny had a "culpable state of mind."  By her own affidavit, Nurse Practitioner Smith states that she was made aware of the plaintiff's plight and his need for pain medication.  Additionally, Dr. Katiny states that he was aware of the plaintiff's treatment needs also.  (See Exhibits B and C of the Defendants' Motion to Dismiss and in the Alternative for Summary Judgment).  The plaintiff contends that he received no medication whatsoever during the time period that he was in the Booking area of Southwestern. (Complaint paragraphs 29-33).  He would submit that to allow a human being to suffer as he states he did while in that booking area cell, as he contends happened in his complaint, absolutely shows an "unnecessary and wanton infliction of pain."  This is more than an "inadvertnt [sic; inadvertent] failure to provide adequate medical care," or a "mere disagreement" as to the direction or nature of treatment as Defendants Smith and Katiny tell the plaintiff that "there was nothing she could do for him" and that he was "ruined," respectively.  (Complaint paragraphs 31 and 32).  The plaintiff would assert that by allowing him to suffer as he did, and deliberately withhold his Lortab during that period, and by the statements they made to him, state a legitimate claim under the subjective component of the deliberate indifference standard.

(Id. at 7-8).

Plaintiff's Response further contends that defendants Smith and Katiny are not entitled to qualified immunity.  He contends that they were not "simply exercising their best judgment" in refusing to give him his pain medication during his time in

booking.   (Id. at 8-9).   Plaintiff further asserts that "by
allowing the plaintiff to lay in that booking area cell for three
days without any type of medication for his pain violated his
constitutional rights, or they certainly should have known [that it
did.]" (Id. at 9).   Petitioner calls the alleged failure to give
him any pain medication for two or three days after his return from
LRMC a "glaring issue of material fact."   (Id. at 9-10).   He
further states that:

> although there are references to the contrary in the
> defendants' exhibits, this Court should decide "in the
> light most favorable to the . . . non-movant, and draw
> all inferences in [his] favor without weighing the
> evidence or assessing witness credibility." Dennis v.
> Columbia Creighton Med. Ctr. Inc., 290 F.3d 639 (4th Cir.
> 2002).   Neither summary judgment nor dismissal is
> appropriate in this action.  The plaintiff has shown that
> there are genuine issues of material [fact] present in
> this case.  He has shown that defendants Smith and Katiny
> are persons acting under the color of state law, and that
> they are not entitled to good-faith immunity for their
> conduct  because  they  violated  the  plaintiff's
> constitutional rights by their actions.  The plaintiff
> has also presented a claim that meets the legal threshold
> for an Eighth Amendment claim, and he has shown that
> summary judgment is not appropriate, and that a Rule
> 12(b)(6) dismissal is not in order as well.

(Id. at 10).   Plaintiff also attached his own affidavit to his
Response, in which he emphasizes that, upon his return from the
LRMC to the SWRJ, he "informed the employees (both staff and
medical) of the fact that [he] was in great pain." He further
states that despite that fact, he was not given any pain medication
until he was moved to the medical unit two or three days later.
(Id. at 12).

On November 6, 2009, defendants Katiny and Smith filed a Reply (# 52), which states in pertinent part:

> The plaintiff's primary complaint in this matter is that he was not given the pain medication that he believes he should have received. In that regard, the plaintiff's complaint amounts to nothing more than his assertion that these defendants were obligated to order that he be given the same medication previously prescribed by the emergency room physician at Logan Regional Medical Center. In other words, plaintiff contends that these defendants should defer their medical judgment for the judgment of an emergency room physician.
>
> The plaintiff was treated with pain medication appropriately ordered by these defendants. The affidavit of Cheryl[e] Stuart, RN, and Vicki Smith, APRN-BC, establish that Ultram, 50 mg., to be given twice a day, was promptly ordered for the plaintiff upon his return from the Logan Regional Medical Center's emergency department. Ultram is a narcotic-like medication that is effective in the treatment of pain. However, the fact that the plaintiff did not agree with that specific pain medication that was ordered for him does not constitute deliberate indifference to a serious medical need. The plaintiff's medical needs, whether they were serious or otherwise, were being addressed both with pain medication and referrals with follow-up visits by a qualified orthopedic surgeon. The plaintiff was not subjected to the "unnecessary and wanton infliction of pain." He simply didn't have his pain treated with the specific medication that he thought he should receive.

(Id. at 2).

On June 25, 2010, Plaintiff filed another Response, which basically repeated verbatim, everything he had argued in his first response, and including the same affidavit (# 76). This second response was filed because the undersigned had granted Plaintiff a 60-day continuance to conduct any discovery he believed necessary in order to be able to fully respond to the defendants' motion.

Because Plaintiff added no new facts or argument in his second response, the undersigned will not repeat those arguments herein.

On July 2, 2010, defendants Katiny and Smith filed a Second Reply (# 79). The Second Reply states in pertinent part:

> If it were true that the plaintiff did not receive any pain medication during the two to three days he was in the booking department after his return from Logan Regional Medical Center, such an omission would not have been the fault of Vicki Smith, APRN, or Antoine Katiny, M.D. Nurse Practitioner Smith made an appropriate order on June 17, 2007, that the plaintiff's Ultram dose be increased. Nurse practitioners, such as Ms. Smith, and physicians, such as Dr. Katiny, do not dispense routine medications to prisoners. The staff nurses at the jail are responsible for dispensing routine medications.
>
> However, the plaintiff did, in fact, receive his Ultram during the period immediately following his injury. This is evidenced by the Medication Charting Record portion of the plaintiff's medical records from the Southwestern Regional Jail. That Medication Charting Record documents medications that were given to the plaintiff on a month-by-month basis. A copy of the Medication Charting Record from the plaintiff's chart for the month of June 2007 is attached to this reply as Exhibit 1. Not only was the plaintiff given the pain medication Ultram during the days following his alleged assault, but he was also given the medication Naprosyn. Ultram, which had a generic name of Tramadol, is a narcotic-like pain reliever that is indicated for the relief of moderate to severe pain. Naprosyn, which had the generic name, Naproxyn, is a non-steroidal, anti-inflammatory medication that is used to treat pain and inflammation.
>
> The affidavits of Vicki Smith, APRN and Cheryle Stuart, RN, and the Medication Administration Record of medications dispensed to the plaintiff during the month of June 2007 belie the plaintiff's contention that "he received no medication whatsoever during the time period that he was in the booking area of Southwestern." *See* plaintiff's Memorandum of Law in Opposition, page 8.

(# 79 at 3-4).

The undersigned proposes that the presiding District Judge **FIND** that the undisputed facts concerning the medical treatment Plaintiff received from defendants Katiny and Smith fail to establish that the defendants were deliberately indifferent to Plaintiff's serious medical need. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that defendants Katiny and Smith are entitled to qualified immunity on Plaintiff's Eighth Amendment claims against them, and further **FIND** that defendants Katiny and Smith are entitled to judgment as a matter of law on those claims.

Therefore, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion for Summary Judgment (# 39-2) filed by defendants Katiny and Smith, and **DENY AS MOOT** the Motion to Dismiss (# 39-1) filed by defendants Katiny and Smith.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), the Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections,

identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Synder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff and counsel of record.

_____          _Mary E. Stanley_____
    August 24, 2010                      Mary E. Stanley
         Date                            United States Magistrate Judge

27