IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

**ANTHONY T. MALCOMB,**

    **Plaintiff,**

v.                                        **Case No. 2:09-cv-00647**

**DR. DESIGNU RAJA,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

On June 9, 2009, Plaintiff filed a Complaint alleging that he received inadequate medical care and attention while he was incarcerated at the Southwestern Regional Jail (the "SWRJ"). (Complaint, ECF No. 3)[1]. On March 29, 2010, Plaintiff was permitted to amend his Complaint against Dr. Raja. (ECF Nos. 57 and 65). The only remaining claim is against Dr. Designu Raja, alleging that Dr. Raja was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution's cruel and unusual punishment clause. Pending before the court is Dr. Raja's Motion for Summary Judgment (ECF No. 110).

---

[1] On August 12, 2009, the undersigned granted Plaintiff's Motion to Amend the Complaint to substitute Dr. Antoine Katiny and Nurse Practitioner Vickie Smith in place of two "John Doe" defendants. (ECF No. 28). Accordingly, the undersigned will refer to the Complaint as the "Amended Complaint," even though the Amended Complaint did not amend any allegations against Dr. Raja.

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTUAL BACKGROUND AND CLAIMS

This action arose on or about June 15, 2007, when Plaintiff was allegedly assaulted by another inmate at Southwestern Regional Jail, and sustained a broken collarbone. He was taken to Logan Regional Medical Center where he was x-rayed, assessed, given a brace and sling, and prescribed pain medication. He was returned to the SWRJ the same day.

Subsequently, Plaintiff was seen four times by defendant Raja beginning June 27, 2007. At the first visit, Plaintiff alleges that:

> Dr. Raja performed a scant examination on the plaintiff and informed him that the break would heal on its own accord, but it would be deformed by a calcium deposit. Dr. Raja said the plaintiff did not need surgery. He told him to wear a sling and to come back in four to six weeks for a follow-up examination. He told the plaintiff to keep on taking Darvocet.

(ECF No. 3 at 8, ¶ 34). Plaintiff alleges that he saw Dr. Raja three more times and that Dr. Raja continued to state that surgery on Plaintiff's shoulder and collarbone was not necessary and that Dr. Raja refused to operate on Plaintiff because Plaintiff is bipolar. (Id., ¶ 36; ECF No. 57, ¶ 50(d)). On this allegation

2

alone, and without further explanation, the plaintiff asserts that Dr. Raja also violated the Americans with Disabilities Act and the Rehabilitation Act of 1973. (ECF No. 57 at 2).

Plaintiff further alleges that, after his transfer to the Mount Olive Correctional Complex on December 1, 2007, he was examined by medical staff and told that "a bone fragment remained in his shoulder and surgery would be required to take it out." (Id., ¶¶ 37-38). Plaintiff was subsequently transferred to the Huttonsville Correctional Center, where he alleges he was told that nothing could be done for his collarbone and that he was given no medication for it. (Id., ¶¶ 39-40).

In May 2008, Plaintiff was transferred to the Denmar Correctional Center. While incarcerated there, Plaintiff was sent to an outside doctor in Pocahontas County, West Virginia. That doctor referred Plaintiff to another doctor in Lewisburg, West Virginia, Dr. Stephen Vess. Dr. Vess subsequently referred Plaintiff to Dr. George Bal, an orthopedic surgeon in Morgantown, West Virginia. Plaintiff's Complaint further states:

> 44. Dr. Bal[] examined the plaintiff in late 2008, and told him he needed surgery to correct the break in his collarbone and to remove the bone fragment. Doctor Bal[] stated: "It (the surgery) certainly should have been done when the injury first occurred."
>
> * * *
>
> 46. Finally, on February 18, 2009, the plaintiff was taken to Ruby Memorial Hospital in Morgantown, West Virginia, and had cadaver tendons placed in his

3

>       collar-bone to correct the problem, and had the
>       bone fragment removed from his shoulder.
>
>   47. In April 2009, the plaintiff's collar-bone again
>       became separated from his shoulder.

(Id. at 9, ¶¶ 44, 46-47). Plaintiff seeks declaratory relief and compensatory damages from Dr. Raja. (Id., ¶¶ 51, 52).

## **PROCEDURAL HISTORY**

A Motion to Dismiss filed by Dr. Raja was denied on April 21, 2010 (# 69). In his response to that Motion to Dismiss, Plaintiff affirmatively stated that he was not alleging a claim of medical malpractice or negligence against Dr. Raja. Rather, he was only alleging a claim of deliberate indifference to a serious medical need, in violation of Plaintiff's right to be free from cruel and punishment under the Eighth Amendment. (ECF No. 56 at 5).

Following the denial of his Motion to Dismiss, on July 1, 2010, Dr. Raja filed an Answer to the Amended Complaint (ECF No. 78). On August 27, 2010, the undersigned entered a Time Frame Order, setting deadlines for discovery and dispositive motions. In that Order, Plaintiff was advised of his right and obligation to respond to any dispositve motion filed by Dr. Raja, in accordance with the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). (ECF No. 83).

On October 13, 2010, the undersigned granted Dr. Raja's motion to extend the discovery and dispositive motion deadlines, and entered an Amended Time Frame Order, which contained another

4

Roseboro notice. (ECF No. 98).

On November 30, 2010, pursuant to the Amended Time Frame Order, Dr. Raja filed the instant Motion for Summary Judgment, with attached exhibits (ECF No. 110). Despite receiving two Roseboro notices, Plaintiff did not respond to the Motion for Summary Judgment.

On May 4, 2011, the plaintiff filed a Motion for Setting of Trial Date, in which he states that "neither party had filed a dispositive motion . . . ." (ECF No. 115). Thus, it appeared that the plaintiff did not receive a copy of the defendant's Motion for Summary Judgment.[2] Thus, on May 6, 2011, the undersigned entered an Order directing the Clerk's Office to mail a copy of Dr. Raja's Motion for Summary Judgment and the attachments thereto (ECF No. 110), as well as the defendant's Supplemental Exhibit to Motion for Summary Judgment (ECF No. 119) to the plaintiff, and set new deadlines for the plaintiff's response and the defendant's reply. (ECF No. 120). The May 6th Order contained yet another Roseboro notice, and advised the plaintiff that a failure to respond to the motion may result in entry of summary judgment denying the relief sought in the Complaint and dismissing the suit. (Id.)

---

[2] The defendant's counsel advised the undersigned's staff that the Motion for Summary Judgment was served on the plaintiff by certified mail, return receipt requested, and that the return receipt was received by his office. At this time, the undersigned has not asked defendant's counsel to file the return receipt.

On May 24, 2011, the undersigned granted the plaintiff's motion for an extension of time to file his response, and extended the response deadline to June 10, 2011. (ECF No. 122). No response has been filed as of today's date. This matter is ripe for determination.

## STANDARD OF REVIEW

**A.  Summary judgment.**

In evaluating summary judgment motions, Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2) (2009). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.

Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

If the moving party meets this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c)(2); Id. at 322-23.

> [A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2).

A court must neither resolve disputed facts, nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

**B.     Deliberate indifference to a serious medical need.**

In Farmer v. Brennan, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" Id., at 833.

To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." Id., at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id., at 837.

Plaintiff's Complaint alleges that Dr. Raja exhibited a deliberate indifference to Plaintiff's serious medical needs, in

violation of his Eighth Amendment rights. "In order to state a cognizable claim for denial of medical care under the Eighth Amendment, an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting cases). "Serious medical needs" are those which have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Munic. of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).

> Deliberate indifference may be demonstrated by either actual intent or reckless disregard. See Benson v. Cady, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. See id. Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. See Estelle, 429 U.S. at 106.

Miltier, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need by correctional officials and health care

providers is very heavy.  It is well settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain.  See Farmer, 511 U.S. at 832-35; Sosebee v. Murphy, 797 F.2d 182-83 (4th Cir. 1986); Loe v. Armistead, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

Rush v. VanDevander, 2008 WL 495651 (W.D. Va., Feb. 21, 2008); Banks v. Green Rock Correctional Center Medical Dept., 2007 WL 2903673 (W.D. Va., Oct. 3, 2007).  For example, in Sosebee, the Fourth Circuit found that if prison guards were aware that a steak bone had pierced an inmate's esophagus, causing infection that resulted in the inmate's death, and the guards had intentionally abstained from seeking medical help, such conduct might establish deliberate indifference to a serious medical need.

In Webster v. Jones, 554 F.2d 1285 (4th Cir. 1977), the plaintiff, who had complained numerous times of eye problems and loss of vision, claimed that he was cursorily examined after his initial complaint, but never re-examined despite later complaints. The doctor claimed that he examined Webster several times, but never diagnosed a medical problem with his eye.  Id. at 1286. Subsequently, a specialist found that Webster's vision had deteriorated to 20/400 and that he suffered from a detached retina and iritis, and that his vision could not be restored.  Id.  The Fourth Circuit found that, even if the doctor had been negligent in failing to properly diagnose or treat Webster, negligence is not

10

sufficient to demonstrate deliberate indifference to a serious medical need and, thus, Webster's allegations did not constitute a cognizable constitutional claim. See also, Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

Likewise, disagreements between a health care provider and the inmate over a diagnosis and the proper course of treatment are not sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). As noted by the Fourth Circuit, an inmate is not entitled to unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate. Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977).

## **ANALYSIS**

Dr. Raja has provided an Affidavit summarizing his treatment of Plaintiff. The Affidavit indicates as follows:

    5.    My first encounter with plaintiff concerning his clavicular fracture occurred on June 27, 2007, at Logan Regional Medical Center.

    6.    At that time, I reviewed the x-rays taken at Logan Regional Medical Center on June 17, 2007, and noted plaintiff had a clavicular fracture. After reviewing the x-rays, I informed plaintiff that, although an open reduction and internal fixation was an option for treating this type of fracture, I believed he was not a proper candidate for an[] open reduction because of [] his other medical issues and the minor nature of the degree of deformity. I further explained to plaintiff that

       even if I were to perform an open reduction and internal fixation that there still remained a good possibility of non-union, again given plaintiff's other medical issues. I further still explained that if a nonunion developed without the performance of an open reduction that an open reduction could always be performed at a later date if the plaintiff had any persistent pain. Additionally, I informed plaintiff that at a later stage, excision of the outer end of the clavicle could be done in the event of incapacitating pain. On the other hand, if the plaintiff did not have significant symptoms, he could continue the nonoperative approach of treatment. Finally, I explained to plaintiff that an open reduction and internal fixation with pinning and possible allograft could carry more risk of implant failure considering plaintiff's lack of post operative management during the healing process due to his other medical conditions. Based on all the information I had, I believed and still do believe that the nonoperative method of treatment was preferable. All of this information was given to and explained to the plaintiff, himself, as well as the security guard who accompanied him to the office visit.

7.   On July 20, 2007, the plaintiff presented for an appointment. The plaintiff did not complain[] of pain at this visit. However, he stated that he felt a clicking sensation with some ache off and on[]. I explained to the plaintiff the prognosis with regard to probable healing of the fracture with cortical contact of the comminuted fractures of the outer end of the clavicle for a period of ten to twelve weeks. I further explained that only in the event of a painful non-union and persistent pain, he may require surgical intervention.

8.   On August 17, 2007, the plaintiff presented for another follow-up appointment and again denied any pain. X-rays were taken of the left clavicle and revealed excellent alignment and position being maintained and also evidence of callous formation. The x-rays were shown to the plaintiff and prognosis explained.

    9.   On October 29, 2007, the plaintiff presented for continued follow-up, this time for the first time complaining of aches and bony thickening at the fracture site. On examination there was moderate tenderness at the fracture site. There was no mobility or crepitus at the fracture site and I noted no neurovascular deficit. I advised the plaintiff to return in six weeks and explained to him that the bony thickening is expected throughout his lifetime and only in the event of well established nonunion with or without avascular necrosis of the outer end fragment of the left clavicle surgical intervention, excision of the outer end of the clavicle may have to be considered after many months and that this could be done with a second opinion at the tertiary care center. From a clinical point-of-view, there was satisfactory healing of the fracture at that time. X-rays were shown to the plaintiff and the security guard that accompanied him and I explained that further x-rays during future follow-up visits would determine the extent of the union or possible development of nonunion.

    10.   The plaintiff did not return to me for any future follow-up.

(ECF No. 110, Ex. F).[3]

Dr. Raja's Motion for Summary Judgment asserts that the uncontroverted evidence of the case establishes that Dr. Raja was neither objectively, nor subjectively, deliberately indifferent to Plaintiff's serious medical needs and, thus, Dr. Raja is entitled to judgment as a matter of law on Plaintiff's Complaint. (ECF No.

---

[3] When the defendant's motion was filed, the Affidavit of Dr. Gary D. Poeling was inadvertently omitted as an exhibit. The affidavit has been separately filed as what is now "Exhibit G" (see ECF No. 119). The affidavit of Dr. Raja is docketed as "Exhibit F." (See ECF No. 110, Ex. F). The two exhibit letters are reversed in the defendant's Motion for Summary Judgment, but are correctly referenced herein.

110 at 4). During discovery, Dr. Raja deposed Plaintiff's treating doctors, Dr. Steven Vess and Dr. George Bal (the doctor who performed Plaintiff's surgery). Both doctors testified that they believed Dr. Raja's treatment of Plaintiff was appropriate and within the applicable standard of care.

In his deposition, Dr. Vess indicated that "the majority of the orthopedic surgeons in the United States, I'd say upwards to 90 to 95 percent will treat this type of injury in a closed fashion, would not recommend operative intervention at all." (ECF No. 110, Ex. D, at 18). Dr. Vess further stated:

> Typically the way we will treat it is to put them in a sling-type situation where you try to keep the humerus a little elevated just to take the pressure off the joint but leaving them in that sling upwards of four weeks. And what you're actually doing is you're trying to let the damaged soft tissue heal in. Now, I also try to stress to that patient though, even if this injury heals, which the majority of them will and even if it becomes completely pain free which the books tell us up to 50 percent of them will be pain free. Even if that happens, they will always have a cosmetic deformity of that side. In other words, it will always look a lot different on the injured side than the uninjured side when you compare the two.
>
> Typically, I will also tell them there may be some orthopedic surgeons, a very, very small percentage of orthopedic surgeons in the United States that may consider treating this operatively. But at this point, the gold standard according to the orthopedic literature is still considered closed treatment or conservative treatment for this injury.

(Id. at 18-19). Dr. Vess then described the surgical options (id. at 20-21), but went on to discuss why he did not recommend surgery when he examined Plaintiff, and why he referred Plaintiff to Dr.

Bal. He stated:

> Because again, surgery for this type of problem is, let's say, rarely done. It's not something you encounter very often. Doctor Bal at WV was actually a shoulder specialist in sports medicine. And Doctor Bal has probably done, if you look at our state as a whole, probably done more --- seen more of these patients with this particular problem than anyone else in the state. And again, my question to Doctor Bal was number one, would you recommend surgery; number two, if he is a --- if you do deem him a surgical candidate, would you accept his care because you have the most experience.

(Id. at 22).

Concerning Plaintiff's complaints of chronic, severe pain and his request for narcotics, Dr. Vess testified "if we can control his pain with a non-narcotic pain medication, why take the risk on this individual getting dependent, again, either psychologically or physically, on a narcotic when we may be able to handle it in a better manner." (Id. at 24-25).

Dr. Vess did not review Dr. Raja's records concerning his treatment of Plaintiff. However, Dr. Vess testified that he would have followed a similar protocol had he been Plaintiff's treating physician immediately following the injury, rather than over one year later. He stated:

> Okay. From what I can detail from this patient's history at the time of his original injury he had no neurologic deficit. He had no vascular deficit. * * * In that scenario I am like the majority of orthopedic surgeons in the United States. I would have treated this by what we consider the gold standard which is conservative treatment, non-operative intervention. Again, sling for four weeks and after about four to five weeks begin a physical therapy program to see if we can strengthen the shoulder back up at this point and see if we can get him

>a good shoulder he can use and as pain free as possible, at least a shoulder that will allow him to do his daily ADLs and what he needs to do. But again, I would not have recommended operative intervention.

(Id. at 29-30).

Dr. Bal first saw Plaintiff on February 12, 2009. He described Plaintiff's complaint as follows:

>Mr. Malcomb was referred to me on his first clinic visit of 12 February, 2009. At that time, Mr. Malcomb explained to me that in June of 2007, he was involved in an altercation with another inmate while he was incarcerated. He stated that it was initially treated with a sling conservatively.
>
>Subsequent to that, he had developed persistent complaints of pain even with activities of daily living and was having some complaints of numbness and tingling into his upper extremity. On physical exam at that time, he had some limitations to his range of motion. And he had a noticeable deformity over his left AV joint. X-rays revealed a distal clavicle non-union as well as an AV joint separation.

(ECF No. 110, Ex. E, at 9-10). Dr. Bal agreed that "a number of people would probably treat that conservatively. So it's not uncommon." (Id. at 10). Dr. Bal further testified:

>I discussed options with him, which would have been continued conservative treatment versus surgery. And he elected for surgery at the time because of his symptoms. * * * What I did was I removed the distal fragment that had not healed then I reconstructed the ligaments for the distal clavicle to try and stabilize it.

(Id. at 11-12). Concerning his follow-up treatment, Dr. Bal stated:

>Well, he came to see me for one visit after surgery, and that was on 2 March of 2009. He was about two weeks out from surgery and he was actually doing very well. His x-rays showed that the distal clavicle was in good

16

> position. He was in his brace and said he was not having a whole lot of pain. He was supposed to continue to wear his brace for another four weeks and then was to return for me to advance his activities. He never subsequently returned for follow up.

(Id. at 12).

Dr. Raja also obtained an Affidavit from Dr. Gary D. Phoeling, a Professor of Medicine at the Bowman Gray School of Medicine in Winston-Salem, North Carolina, who agreed that Dr. Raja's treatment did not violate the applicable standard of care. (ECF No. 119, Ex. G).

Dr. Raja's Affidavit asserts that he used his best medical judgment in treating Plaintiff and that he was not deliberately indifferent to any serious risk of harm to Plaintiff. (ECF No. 110, Ex. F, ¶¶ 10-12). Dr. Raja's motion contends that Plaintiff's claim against him amounts to nothing more than a dispute over the proper course of treatment, which is not actionable under the Eighth Amendment. (ECF No. 110 at 4). Plaintiff has not countered Dr. Raja's contentions.

The undersigned proposes that the presiding District Judge **FIND** that the undisputed facts fail to establish that Dr. Raja was deliberately indifferent to Plaintiff's serious medical needs, in violation of the plaintiff's Eighth Amendment rights. Plaintiff has not demonstrated that Dr. Raja acted recklessly by disregarding a known substantial risk of danger or that his treatment of Plaintiff was "so grossly incompetent, inadequate, or excessive as

17

to shock the conscience or to be intolerable to fundamental fairness."

The undersigned further proposes that the presiding District Judge **FIND** that the plaintiff has offered nothing more than his bare allegation that Dr. Raja's conduct violated either the Americans with Disabilities Act or the Rehabilitation Act of 1973. Accordingly, the undersigned proposes that the presiding District **FIND** that award of summary judgment to Dr. Raja is also appropriate on those allegations.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that Dr. Raja is entitled to judgment as a matter of law on Plaintiff's claims. Therefore, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Dr. Raja's Motion for Summary Judgment (ECF No. 110) and dismiss this civil action from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with

the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Copenhaver.

The Clerk is directed to file this "Proposed Findings and Recommendation," to mail a copy of the same to Plaintiff, and to transmit it to counsel of record.

    June 20, 2011                         *Mary E. Stanley*
        Date                               Mary E. Stanley
                                           United States Magistrate Judge